# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PLUMBERS & PIPEFITTERS LOCAL 178 HEALTH & WELFARE TRUST FUND, on behalf of itself and all others similarly situated, | |
| Plaintiff, | Case No. |
| v. | **CLASS ACTION COMPLAINT** |
| TEVA PHARMACEUTICALS USA, INC.; UPSHER-SMITH LABORATORIES, INC.; PAR PHARMACEUTICAL, INC.; and LANNETT COMPANY, INC., | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff Plumbers & Pipefitters Local 178 Health & Welfare Trust Fund ("Local 178" or "Plaintiff"), by and through the undersigned counsel, allege the following based upon information and belief, investigation of counsel, publicly available information, and data obtained from non-parties:

## INTRODUCTION

1.      Local 178 brings this action on behalf of itself and on behalf of all persons and entities in the United States and its territories who purchased, paid, and/or provided reimbursement for some or all of the purchase price of generic Baclofen tablets ("Baclofen") manufactured, marketed, and sold by Defendants on or after February 1, 2014.

2.      Baclofen is a muscle relaxer and an antispastic agent that is used to treat muscle spasms, cramping, and tightness; muscle symptoms of certain muscular disorders; and spinal cord injuries and diseases. It is used primarily as a treatment for multiple sclerosis ("MS")—as

1

treatment for flexor spasms and accompanying pain, involuntary muscular contractions and relaxations known as clonus, and muscular rigidity.

3.     Baclofen acts on the central nervous system to inhibit nerve reflex signaling in the spine and other nerve sites. Chemically, it is related to gamma-aminobutyric acid ("GABA"), a naturally occurring neurotransmitter in the brain that, when released, causes the activity of other nerves to decrease. While it is not known exactly how Baclofen works, it is believed that Baclofen, acting like GABA, blocks the activity of nerves within the part of the brain that controls the contractions and relaxation of skeletal muscles. Studies in animals confirm that it has a depressant effect on the central nervous system. It does not act as a cure, but rather as a therapeutic treatment of muscle symptoms.

4.     Baclofen is taken orally in tablet form, in either 10 mg or 20 mg tablets. It is usually prescribed in a daily, divided dose of between 40 and 80 mg total. Patients who require a higher dosage of Baclofen may take it through an injection directly into the spinal cord.

5.     Baclofen was first developed by Ciba-Geigy (now Novartis) in 1962. Originally developed to treat epilepsy, it was found to work best at treating muscle spasticity and became a treatment for MS. The United States Food and Drug Administration ("FDA") first approved Baclofen in November 1977. In 1982, generic Baclofen first entered the market (with FDA approval).

6.     Bacloflen is an incredibly important drug for those afflicted with MS. For example, the United Kingdom's National Institute for Health and Care Excellence's guidance for

2

MS lists Baclofen "as a first-line drug to treat spasticity" in MS patients.[1] Millions of Baclofen tablets are sold each month, with over $100 million in monthly sales market-wide.

7.    Local 178 alleges that Defendants—the dominant manufacturers, marketers, and sellers of Baclofen—have for years unlawfully conspired, combined, and contracted to fix, raise, maintain, and stabilize Baclofen prices, allocate customers, and rig bids, all with the intent and effect of restraining competition in the Baclofen market in the United States.

8.    The claims in this case arise from a broad conspiracy among manufacturers of generic drugs to fix the prices charged for various generic drugs in recent years. This conspiracy was effectuated by joint activities and direct company-to-company, person-to-person contacts between and among generic drug manufacturers, including through trade shows, customer events, trade association gatherings, and private dinners. The unlawful acts undertaken with respect to Baclofen arise from that larger conspiracy.

9.    After years of stable and flat pricing, all four Defendants—acting in concert in furtherance of their unlawful agreement—abruptly raised their prices for Baclofen (over an eight-month period in 2014) until coming to rest at substantially the same elevated level, ***an increase of some 300% to 400%***. Defendant Upsher-Smith Laboratories, Inc. ("Upsher-Smith") began the price hikes in February of 2014, followed by Defendant Teva Pharmaceuticals, U.S.A., Inc. ("Teva") in April of 2014, with Defendant Lannett Company, Inc. ("Lannett") next in July of 2014, and then, finally, Qualitest Pharmaceuticals Co. ("Qualitest") (now part of Defendant Par Pharmaceutical, Inc. ("Par"), an operating company of Endo International plc ("Endo")) in October of 2014.

---

[1] National Institute for Health and Care Excellence, "Multiple sclerosis in adults: management," Oct. 2014, https://www.nice.org.uk/guidance/CG186/chapter/1-Recommendations (last accessed Mar. 17, 2017).

10.    These extraordinary price increases were not the result of supply shortages, demand spikes, or other market conditions. Rather, they were the result of Defendants' coordinated and collusive efforts and agreement, which violate the Sherman Act (15 U.S.C. § 1, *et seq.*), as well as state antitrust, consumer protection, and common laws.

11.    These and other recent precipitous price hikes by drug manufacturers for generic drugs have prompted extensive scrutiny by the press, the United States Congress, and federal and state antitrust regulators. In 2014, the Antitrust Division of the United States Department of Justice ("DOJ") commenced a wide-ranging criminal investigation of this broad conspiracy and caused grand jury subpoenas to be issued to various generic drug manufacturers in connection with this investigation.[2] That federal investigation has already yielded two guilty pleas. In July of 2014, the State of Connecticut likewise initiated an investigation into suspicious price increases for certain generic pharmaceuticals, in coordination with other states. The information developed through that multi-state investigation, which is still ongoing and now includes 40 states, has uncovered evidence of a broad, well-coordinated, and long-running series of schemes to fix the prices and allocate markets for various generic drugs in the United States.

12.    At least three of the Defendants—Teva, Lannett, and Par—have received grand jury subpoenas in connection with the ongoing federal and state investigations of anticompetitive practices in the generic pharmaceutical industry.

13.    These subpoenas accompanied public reports that highlighted concerns about the rising prices of generic drugs generally—and Baclofen more specifically. For example, American Pharmacies, a group of independent pharmacists that monitors the pricing of generic

---

[2] The investigation encompasses a number of generic drugs and, as the scope of the states' and the DOJ's investigation is further clarified, Plaintiff reserves the right to amend its complaint to add more parties and/or claims.

drugs and issues notices to customers, warned in February 2014 of the recently announced "[m]arketwide price increases of more than 500% . . . occurring in Baclofen tablets."[3]

14.     As a result of Defendants' unlawful conduct, Plaintiff and the other members of the proposed Classes paid artificially inflated prices during the Class Period that exceeded the amount they would have paid if a competitive market had determined the prices for Baclofen, and the Defendants realized more revenue and profits than they would have received if a competitive market had determined the prices for Baclofen.

## JURISDICTION AND VENUE

15.     Plaintiff brings this action under Section 16 of the Clayton Act (15 U.S.C. § 26), for injunctive relief and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiff and the members of the Classes by reason of the violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

16.     This action also includes claims under the antitrust, consumer protection, and common laws of various states for damages and equitable relief, as described in Counts Two through Four below.

17.     Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1337 and by Section 16 of the Clayton Act (15 U.S.C. § 26). In addition, jurisdiction is also conferred upon this Court by 28 U.S.C. § 1367. Finally, jurisdiction is conferred upon this Court by the Class Action Fairness Act of 2005 ("CAFA"), which amended 28 U.S.C. § 1332 to add a new subsection (d) authorizing federal jurisdiction where "the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which . . . any

---

[3] American Pharmacies, "Price Rise Imminent on Baclofen Tablets," Feb. 27, 2014, https://www.aprx.org/aprx-generic-edge/generic-alert-2272014 (last accessed Mar. 17, 2017).

member of a class of plaintiffs is a citizen of a State different from any defendant." The $5 million amount-in-controversy and diverse-citizenship requirements of CAFA are satisfied here.

18.     Venue is proper in this judicial district pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C. § 1391(b), (c) and (d) because during the Class Period, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce described below has been carried out in this District.[4]

19.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) sold Baclofen throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) was engaged in an illegal scheme and price-fixing conspiracy that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

## PLAINTIFF

20.     Plaintiff Plumbers & Pipefitters Local 178 Health & Welfare Trust Fund ("Local 178" or "Plaintiff"), located in Springfield, Missouri, is a local union that provides health care and other benefits to its members who reside in Missouri as well as other locations throughout the United States, through its not-for-profit trust fund. Local 178 indirectly purchased Baclofen during the Class Period as defined below, and was injured in its business or property by reason of the violations of law alleged herein. For prescriptions of generic drugs manufactured by one or more Defendants (such as Baclofen), the employee plan participant typically pays a portion of

---

[4] As used herein, the term "Class Period" means February 1, 2014 to the present.

the cost of the prescription. Participating pharmacies collect the co-payment from the employee plan participant and bill Local 178 for the remaining cost of the Baclofen purchases.

## DEFENDANTS

21.     Defendant Teva is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 1090 Horsham Road, North Wales, PA 19454. During the Class Period, Teva manufactured, marketed, and sold Baclofen to customers in this District and other locations in the United States.

22.     Defendant Upsher-Smith is a corporation organized and existing under the laws of the State of Minnesota with its principal place of business at 6701 Evenstad Drive, Maple Grove, MN 55369. During the Class Period, Upsher-Smith manufactured, marketed, and sold Baclofen to customers in this District and other locations in the United States.

23.     Defendant Par is a corporation organized and existing under the laws of the State of New York with its principal place of business at 6 Ram Ridge Road, Chestnut Ridge, NY. In 2015, Endo acquired Par, and merged it with another Endo subsidiary, Qualitest. The merged entity is named Par Pharmaceutical. During the Class Period, Qualitest, and later Par, manufactured, marketed, and sold Baclofen to customers in this District and other locations in the United States. References to Par within this complaint include Par as a successor-in-interest to Qualitest.

24.     Defendant Lannett is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 13200 Townsend Road, Philadelphia, PA 19154. During the Class Period, Lannett manufactured, marketed, and sold Baclofen to customers in this District and other locations in the United States.

25.     Whenever in this complaint reference is made to any act, deed, or transaction of

any corporation, the allegation means that the corporation engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

26.     All acts alleged in this complaint to have been done by Defendants were performed by their officers, directors, agents, employees, or representatives while engaged in the management, direction, control, or transaction of Defendants' business affairs.

## CO-CONSPIRATORS

27.     Various other persons, firms, corporations and entities have participated as unnamed co-conspirators with Defendants in the violations and conspiracy alleged herein. In order to engage in the offenses charged and violations alleged herein, these co-conspirators have performed acts and made statements in furtherance of the antitrust violations and conspiracies alleged herein.

28.     At all relevant times, each Defendant was an agent of each of the remaining Defendants, and in doing the acts alleged herein, was acting within the course and scope of such agency. Each Defendant ratified and/or authorized the wrongful acts of each of the Defendants. Defendants, and each of them, are individually sued as participants and as aiders and abettors in the improper acts and transactions that are the subject of this action.

## INTERSTATE TRADE AND COMMERCE

29.     The business activities of Defendants that are the subject of this action were within the flow of, and substantially affected, interstate trade and commerce.

30.     During the Class Period, Defendants sold substantial quantities of Baclofen in a continuous and uninterrupted flow of interstate commerce to customers throughout the United

States.

## FACTUAL ALLEGATIONS

### The Industry

31.     Defendants manufacture, market, and sell, among other products, generic versions of branded drugs, including Baclofen, for which FDA approval can be sought only after the patent on the corresponding branded drug expires. Here, Baclofen first entered the marketplace in 1982 with FDA approval.

32.     According to the FDA's Glossary, a generic drug is "the same as a brand name drug in dosage, safety, strength, how it is taken, quality, performance, and intended use."[5] Once the FDA approves a generic drug as "'therapeutically equivalent'" to a brand name drug, the generic version "can be expected to have equal effect and no difference when substituted for the brand name product." *Id.*

33.     A drug company seeking approval to market and sell a generic equivalent of a brand name drug must refer to the Reference Listed Drug ("RLD") in its Abbreviated New Drug Application ("ANDA"). *Id.* Once the FDA determines that a drug company's application contains sufficient scientific evidence establishing the bioequivalence of the product to the RLD, an applicant may manufacture, market, and sell the generic drug product, which provides a safe, effective, low-cost alternative to the American public. *Id.*

34.     Furthermore, the FDA will generally assign a Therapeutic Equivalence Code ("TE Code") of AB to those products it determines to be bioequivalent. [6] This coding system

---

[5] FDA Glossary, available at
http://www.fda.gov/Drugs/InformationOnDrugs/ucm079436.htm#G.

[6] http://www.fda.gov/Drugs/DevelopmentApprovalProcess/FormsSubmissionRequirements/

allows users to quickly determine important information about the drug product in question.[7] For example, the FDA states that "[p]roducts generally will be coded AB if a study is submitted demonstrating bioequivalence. Even though drug products of distributors and/or repackagers are not included in the List, they are considered therapeutically equivalent to the application holder's drug product if the application holder's drug product is rated AB."[8]

35.    The purpose of this generic-approval process, and the resulting creation of an entire generic-drug industry in the United States, is to facilitate, authorize, and encourage the manufacture of less expensive, non-branded substitutes for branded prescription drugs that either have no patent exclusivity or for which the patent exclusivity has expired. Once the patent on a brand-name drug expires, generic manufacturers can move in, creating more competition and lower prices. In a January 2012 report, the Government Accounting Office noted that "[o]n average, the retail price of a generic drug is 75 percent lower than the retail price of a brand-name drug."[9]

36.    Due to the significant price differentials between branded and generic drugs, as well as other institutional features of the pharmaceutical industry, pharmacists liberally and typically substitute the generic drug when presented with a prescription for the branded drug. Since passage of the Hatch-Waxman Act (Pub. L. No. 98-417, 98 Stat. 1585 (codified at 15 U.S.C. §§ 355, 360cc; 35 U.S.C. §§ 156, 271)), every state has adopted substitution laws requiring or permitting pharmacies to substitute generic drug equivalents for branded drug

---

ElectronicSubmissions/DataStandardsManualmonographs/ucm071713.htm.

[7] http://www.fda.gov/Drugs/DevelopmentApprovalProcess/ucm079068.htm#TEC.

[8] http://www.fda.gov/Drugs/DevelopmentApprovalProcess/FormsSubmissionRequirements/ ElectronicSubmissions/DataStandardsManualmonographs/ucm071713.htm.

[9] http://www.gao.gov/assets/590/588064.pdf.

prescriptions (unless the prescribing physician specifically orders otherwise by writing "dispense as written" or similar language on the prescription).

37.     According to a report by the Generic Pharmaceutical Association ("GPhA"), nearly 3.8 billion (88%) of the total 4.3 billion prescriptions dispensed in the U.S. in 2014 were filled using generic drugs.[10]

38.     There has been substantial consolidation in the generic drug industry recently. The result of the generic drug industry's consolidation has been an environment ripe for collusion and higher prices for consumers. Generic manufacturers merged as a partial reaction to the consolidation of the distributors, the logic being that generic manufacturers could exert leverage to charge higher prices if distributors were stripped of the option of negotiating lower prices with other generic manufacturers offering therapeutically equivalent drugs. Market consolidation has also resulted in more generic product lines being combined or discontinued, further reducing price competition.

**Market for Baclofen**

39.     Baclofen is chiefly prescribed to treat the symptoms of MS, in addition to other spinal diseases and injuries.

40.     The Baclofen manufactured, marketed, and sold by Defendants comes in just two tablet dosages, 10 mg and 20 mg. When a doctor first prescribes Baclofen, he or she will start the patient on a low dosage, usually about 5 mg three times a day (a split pill), and gradually increase until the optimum effect is achieved (usually between 40 and 80 mg in divided doses over the course of the day). Typically, patients requiring Baclofen will take the drug in two to four doses per day, every day, for the rest of their lives.

---

[10] http://www.gphaonline.org/media/wysiwyg/PDF/GPhA_Savings_Report_2015.pdf.

41.     Defendants collectively sell over a billion dollars of Baclofen annually in the United States. In 2015, the Defendants made the following Baclofen sales in the United States: Teva—$989,454,189.00;      Qualitest—$437,932,063.00;      Upsher-Smith—$345,575,950.00; Lannett— $59,409,688.00.

42.     The market for Baclofen is controlled by Defendants, and it was controlled by Defendants during the Class Period.

**Defendants' Pricing Conduct for Baclofen**

43.     Baclofen pricing was remarkably stable for many years until early 2014.

44.     During the Class Period and beginning in or around October 2013, however, the Defendants, through their sales representatives and senior management, met in person and/or otherwise communicated by phone, email, text message, and other means to discuss pricing and pricing strategies for Baclofen, ultimately agreeing to forgo competition and fix the prices at which Baclofen would be sold in its various dosages. These meetings often corresponded with pricing activity indicative of a conspiracy.

45.     Defendants' staggered lockstep price increases over a short eight-month window are likewise indicative of collusion. Staggered price increases (that nevertheless reach the same elevated levels) are a frequent hallmark of cartels that hope to evade detection.

46.     All four Defendants sent representatives to the 2013 annual GPhA Fall Technical Conference, which was held from October 28-30, 2013 at the Bethesda North Marriott Hotel & Conference Center in Bethesda, Maryland. On information and belief, during that event, Defendants discussed Baclofen pricing in furtherance of their conspiracy. Four months later, and just after Upsher-Smith began the collective price hike, Defendants convened again at the GPhA Annual Meeting in Orlando, Florida at the JW Marriott Orlando Grande Lakes, held on February

19-21, 2014. On information and belief, during that event, Defendants also discussed Baclofen pricing in furtherance of their conspiracy.

47.     Defendants used various other industry events to discuss, effectuate, facilitate, and monitor their price-fixing conspiracy as well. In April 2014, for example, Defendants Teva, Par, and Upsher-Smith met at the annual National Association of Chain Drug Stores ("NACDS") meeting in Scottsdale, Arizona, corresponding with Teva's price hike and Upsher-Smith's price hike a few weeks earlier. All of the Defendants met again during the GPhA CMC Workshop in Maryland held June 3-4, 2014. Shortly thereafter, in July 2014, Lannett instituted its own price hike. In August 2014, all of the Defendants attended the NACDS Total Store Expo in Boston; then, in October 2014, Par instituted its own price hike. The Defendants met again at the GPhA Fall Technical Conference in early November 2014.

48.     By raising their Baclofen prices ***threefold*** and ***fourfold*** during an eight-month window in 2014, Defendants broke with a four-year-or-more period of remarkably flat and stable pricing:



13

49.     From early 2010 through the end of 2013, prices ranged from about $.40 to $.80 per unit. By October 2014, however, each defendant had raised its Baclofen prices by almost 300%. And by 2015, Defendants had achieved the goals of the conspiracy, elevating Baclofen prices spectacularly—and keeping them there for years without losing sales revenue or significant market share. For example, annual sales of Baclofen tablets went from $320 million in 2013 to $1.12 billion in 2014 to $1.85 billion in 2015.

50.     These price hikes cannot be explained by other factors. There were no relevant labelling changes or FDA-reported drug shortages that might have led to price increases. Nor was there a spike in demand that could explain the price hikes. Prior to the 2014 price hikes, the quantity of Baclofen sold and the total associated Baclofen revenue moved in tandem. After the price hike, Defendants reaped enormous profits from Baclofen while the actual quantity sold remained comparatively static, in defiance of previous competitive norms:



51.     Notably, Northstar Rx LLC ("Northstar") and Caraco Pharmaceutical Laboratories, Ltd. ("Caraco"), which together held less than 10% market share throughout the Class Period and are not named as Defendants here, did not institute corresponding price hikes, confirming further the absence of any external market forces that might have caused prices to rise dramatically in 2014. Defendants' overwhelming market share ensured that a four-way conspiracy would be profitable and would not risk losing significant market share to other non-colluding competitors:



52.     The National Average Drug Acquisition Cost ("NADAC") data for Baclofen likewise reveals a pattern of massive price increases beginning in early 2014, after which prices remained elevated well above their previous competitive levels.

53.     The NADAC data is a pricing reference file published by the Centers for Medicare and Medicaid Services that is based on average actual acquisition costs of various

outpatient drugs collected from a monthly survey of retail community pharmacies across the United States.[11]

54.     To provide just one example, the NADAC data reveals a dramatic increase in the average per-unit price for Baclofen 10mg tablets in 100 tablet quantities (for Qualitest, in 90 tablet quantities) marketed and sold by all six Baclofen manufacturers. That per-unit price hovered between. .038 and .039 in late 2013 and early 2014 before rocketing upward to ***at least four times that amount*** and staying there for years.

55.     The sustained price elevation reflected in the NADAC data, across Baclofen in various dosages, was and is the result of a conspiracy among Defendants to artificially raise, fix, maintain, and/or stabilize the price of Baclofen sold in the United States.

### The Effects of Defendants' Pricing Conduct

56.     Defendants' sudden and massive price increases present a sharp departure from the previous years of low and stable prices. This in itself is indicative of collusion.

57.     There were no reasonable justifications for this abrupt shift in pricing conduct. Federal law requires drug manufacturers to report potential drug shortages to the FDA, the reasons therefor, and the expected duration of the shortage. No supply disruption was reported by the Defendants to the FDA with respect to Baclofen. Furthermore, as discussed above, two competitors with small market share did not institute dramatic price hikes at the same time, which provides even more evidence that external market forces did not cause Defendants to increase their prices.

---

[11] *See* https://www.medicaid.gov/medicaid-chip-program-information/by-topics/prescription-drugs/ful-nadac-downloads/nadacmethodology.pdf.

58.    And because generic pharmaceutical manufacturers do not need to incur the large research and development costs that brand manufacturers absorb in developing new drugs, the price increases cannot be attributed to the need to fund research and development. Indeed, Baclofen had been available in generic form for *over 30 years* at the time of the 2014 price spikes.

59.    Industry analysts have also suggested that recent price increases for Baclofen are the result of collusion among manufacturers. Indeed, Richard Evans at *Sector & Sovereign Research* recently wrote: "[a] plausible explanation [for price increases of generic drugs] is that generic manufacturers, having fallen to near historic low levels of financial performance are cooperating to raise the prices of products whose characteristics – low sales due to either very low prices or very low volumes – accommodate price inflation."[12]

60.    This abrupt shift in the pricing of Baclofen has had a catastrophic effect on consumers. As noted in letters sent to generic drug manufacturers as part of a Congressional investigation into unexplained price increases:

> This dramatic increase in generic drug prices results in decreased access for patients. According to the National Community Pharmacists Association (NCPA), a 2013 member survey found that pharmacists across the country "have seen huge upswings in generic drug prices that are hurting patients and pharmacies ability to operate" and "77% of pharmacists reported 26 or more instances over the past six months of a large upswing in a generic drug's acquisition price." These price increases have a direct impact on patients' ability to purchase their needed medications. The NCPA survey found that "pharmacists reported patients declining their medication due to increased co-pays," and "84% of pharmacists said that the acquisition price/lagging reimbursement trend is

---

[12] http://blogs.wsj.com/pharmalot/2015/04/22/generic-drug-prices-keep-rising-but-is-a-slowdown-coming/.

having a 'very significant' impact on their ability to remain in business to continue serving patients." (Footnotes omitted).[13]

61.    A meeting of the minds among the competing sellers of Baclofen assured them increased revenues and profits.

62.    At or around the time of Defendants' conspiratorial communications and Baclofen price hikes, Defendants bragged publicly about their ability to increase prices and realize profits on generics. Just before the conspiracy began, in Lannett's third quarter 2013 earnings call, CEO Arthur Bedrosian noted the company's performance was reliant on price increases and signaled that price increases "will continue throughout fiscal 2014. . . ."[14] Bedrosian further signaled to Lannett's competitors: "So whenever people start acting responsibly and raise prices as opposed to the typical spiral down of generic drug prices, I'm grateful."[15] Bedrosian continued: "So I would expect that all the companies are not going to behave like they have in the past. And I suspect you're going to see more price increases in the generic marketplace . . . ."[16]

63.    Bedrosian aptly summarized the importance of Defendants sticking together in their price hike and issued a direct assurance to Lannett's competitors:

> We believe that these prices are important. We need to try raising them. Sometimes, it doesn't stick and we have to go back and reduce our price, and other times it does…. **_We have more price increases planned for this year within our budget. And hopefully, our competitors follow suit._**[17]

---

[13] The letters sent to generic drug manufacturers may be found at http://www.sanders.senate.gov/newsroom/press-releases/congress-investigating-why-generic-drug-prices-are-skyrocketing.

[14] http://seekingalpha.com/article/1685792-lannett-management-discusses-q4-2013-results-earnings-call-transcript.

[15] *Id.*

[16] *Id.*

[17] *Id.* (emphasis added).

64.     In Lannett's FY2015 Q1 earnings call, Bedrosian confirmed the alignment of incentives among Lannett and its competitors:

> So from my perspective, what we're seeing here is an opportunity to raise prices because everybody has accepted the fact that our costs are going up dramatically and less concerned about grabbing market share. We're all interested in making a profit, not how many units we sell.

65.     These price increases are reflected in Defendants' financial results during the Class Period.

66.     For example, Teva reported a tremendous growth in revenue from 2013 to 2015 from Baclofen alone. In 2013, Teva saw revenues of $15-$20 million monthly from the sale of Baclofen. But in 2014, when prices spiked, Teva's October single-month revenue from Baclofen topped *$100 million*. Lannett's CFO similarly noted the importance of Baclofen in Lannett's FY2015 Q3 earnings call, citing the drug as responsible for a quarter-over-quarter gain of nearly 50%, from $7.9 million to $11.4 million in revenue.[18] The growth in overall Baclofen sales revenue from 2013 to 2015 was extraordinary—and very much the result of conspiracy:

| 2013 Sales | 2014 Sales | 2015 Sales | Total Sales | % Change (2013-2015) |
|------------|------------|------------|-------------|----------------------|
| $320m      | $1.12bn    | $1.85bn    | $3.29bn     | 478%                 |

**Congressional and Regulators' Responses to Rising Generic Drug Prices**

67.     As noted above, drug manufacturers' dramatic and unexplained price hikes have engendered extensive scrutiny by the United States Congress and by federal and state antitrust regulators.

---

[18] http://seekingalpha.com/article/3150136-lannetts-lci-ceo-arthur-bedrosian-on-q3-2015-results-earnings-call-transcript?all=true&find=baclofen.

68.     In a January 8, 2014 letter to members of key committees of the United States House of Representatives and Senate, Douglas P. Hoey, Chief Executive Officer of the NCPA, asked Congress to conduct an investigation of generic drug price increases.[19]

69.     On October 2, 2014, Representative Elijah E. Cummings ("Cummings"), Ranking Member of the House Committee on Oversight and Government Reform, and Senator Bernie Sanders ("Sanders"), Chairman of the Subcommittee on Primary Health and Aging of the Senate Committee on Health, Education, Labor and Pensions, sent letters to Defendants Lannett, Teva and 12 other drug manufacturers, including Par's parent company Endo ("October Letters") asking for detailed information on the generic price hikes.[20]

70.     On November 20, 2014, Sanders's committee held a hearing titled "Why Are Some Generic Drugs Skyrocketing In Price?" ("Senate Hearing"). Various witnesses discussed the price hikes for generic drugs.

71.     At the Senate Hearing, Stephen W. Schondelmeyer, Professor of Pharmaceutical Management & Economics at the University of Minnesota testified concerning "signals of market failure" and noted that "nearly 20% (27 of 280) of the widely used generic drug prices saw an annual price increase of 50% or more in 2013."

72.     Sanders and Cummings followed up on the Senate Hearing by writing a letter on February 24, 2015 to the Office of the Inspector General ("OIG") of the Department of Health & Human Services, asking it to investigate the effect that price increases of generic drugs have had

---

[19] *See* https://www.ncpanet.org/pdf/leg/jan14/letter-generic-spikes.pdf.

[20] The October Letters may be found at https://www.sanders.senate.gov/newsroom/press-releases/congress-investigating-why-generic-drug-prices-are-skyrocketing.

on generic drug spending within the Medicare and Medicaid programs.[21] The OIG responded in a letter dated April 13, 2015, noting it planned to engage in a review of quarterly average manufacturer prices for the top 200 generic drugs from 2005 through 2014.[22]

73.     In the meantime, the Antitrust Division of the United States Department of Justice ("DOJ") commenced a wide-ranging criminal investigation of generic drug pricing and has caused grand jury subpoenas to be issued to various generic drug manufacturers in connection with this investigation. According to a June 26, 2015 report by the service *Policy and Regulatory Report* ("PaRR Report") (available at http://www.mergermarket.com/pdf/DoJ-Collusion-Generic-Drug-Prices-2015.pdf):

> A PaRR source says prosecutors see the case much like its antitrust probe of the auto parts industry, which has gone on for years and morphed into the department's largest criminal antitrust probe ever. Like in that case, prosecutors expect "to move from one drug to another in a similar cascading fashion."

74.     On November 3, 2016, *Bloomberg* reported:

> The antitrust investigation by the Justice Department, begun about two years ago, now spans more than a dozen companies and about two dozen drugs, according to people familiar with the matter. The grand jury probe is examining whether some executives agreed with one another to raise prices, and the first charges could emerge by the end of the year, they said.
>
> . . . .
>
> Charges could extend to high-level executives, according to the people. The antitrust division, which has an immunity program to motivate wrongdoers to confess and inform on others, has stepped up its commitment to holding individuals responsible.[23]

---

[21] http://www.sanders.senate.gov/download/sanders-cummings-letter?inline=file.

[22] http://www.sanders.senate.gov/download/oig-letter-to-sen-sanders-4-13-2015?inline=file.

[23] https://www.bloomberg.com/news/articles/2016-11-03/u-s-charges-in-generic-drug-probe-said-to-be-filed-by-year-end (last accessed March 22, 2017).

75.     On November 7, 2016, the publication *Mlex* reported that the DOJ had received assistance from a leniency applicant beginning in the summer of 2016:

> While the Justice department didn't have a whistleblower at the beginning of the investigation, it is understood that this summer a company applied for leniency, which grants full immunity to the first company to come forward and admit to cartel violations. The company is understood to be privately held and hasn't publicly disclosed its involvement in the investigation.

76.     On December 12, 2016, the DOJ charged Jeffrey Glazer ("Glazer"), the former chief executive officer of Heritage Pharmaceuticals, Inc. ("Heritage"), and Jason Malek ("Malek"), former president of Heritage, with "knowingly enter[ing] into and engag[ing] in a combination and conspiracy with other persons and entities engaged in the production and sale of generic pharmaceutical products, including doxycycline hyclate, the primary purpose of which was to allocate customers, rig bids, and fix and maintain prices of doxycycline hyclate sold in the United States . . . [and] including glyburide, the primary purpose of which was to allocate customers and fix and maintain prices of glyburide sold in the United States." Information ¶ 6, *United States v. Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa. Dec. 12, 2016) (ECF No. 1); Information ¶ 6, *United States v. Malek*, No. 2:16-cr-00508-RBS (E.D. Pa. Dec. 12, 2016) (ECF No. 1). In January 2017, Glazer and Malek both pleaded guilty and agreed to provide full cooperation, not limited to Glyburide and Doxycycline, with "the current federal investigation of violations of federal antitrust and related criminal laws involving the production and sale of generic pharmaceutical products in the United States . . . ." Plea Agreement, ¶18, *United States v. Glazer*, No. 16-cr-506 (E.D. Pa. Jan. 9, 2017) (ECF No. 18); Plea Agreement, ¶17, *United States v. Malek*, No. 16-cr-508 (E.D. Pa. Jan. 10. 2017) (ECF No. 17).

77.     Meanwhile, 40 state attorneys general, led by the Connecticut Attorney General, have also pursued their own investigations, culminating most recently in an amended complaint

filed on March 1, 2017 charging Defendant Teva, as well as Aurobindo Pharma USA, Inc., Citron Pharma, LLC, Heritage, Mayne Pharma (USA), Inc., and Mylan Pharmaceuticals Inc., "with entering into contracts, combinations and conspiracies that had the effect of unreasonably restraining trade, artificially inflating and maintaining prices and reducing competition in the markets for Doxycycline Hyclate Delayed Release ('Doxy DR') and Glyburide in the United States." Amended Complaint, ¶1, *State of Connecticut, et al. v. Aurobindo Pharma USA, Inc., et al.,* No. 3:16-Cv-002056 (VLB) (D. Conn.).[24] The complaint notes that "the Plaintiff States have uncovered wide-ranging conduct implicating numerous different drugs and competitors, which will be acted upon at the appropriate time." *Id.* ¶9. It also details Teva's role in both conspiracies, including through communications with other competitors to facilitate and further their agreement to fix prices in 2014 and 2015. *Id.* ¶¶60, 108-24. Further, the 40 states allege, "[g]eneric drug manufacturers [have] argued publicly that the significant price increases were due to a myriad of benign factors, such as industry consolidation, FDA-mandated plant closures, or elimination of unprofitable generic drug product lines. What the Plaintiff States have found through their investigation, however, is that the reason underlying many of these price increases is much more straightforward, and sinister—***collusion among generic drug competitors***." *Id.* ¶6 (emphasis added).

78.     Connecticut Attorney General George Jepsen noted in December 2016 that "this is just the tip of the iceberg . . . . I stress that our investigation is continuing, and it goes way

---

[24]

http://www.ct.gov/ag/lib/ag/press_releases/2017/20170301_genericdrugs_firstamendedcomplaint_redacted.pdf.

beyond the two drugs in this lawsuit, and it involves many more companies than are in this lawsuit."[25]

79.   Teva is hardly alone in facing government scrutiny and investigation for its role in generic price inflation. On November 4, 2016, Lannett disclosed in its Form 10-Q filed with the Securities and Exchange Commission ("SEC") report that it too had received numerous federal and state subpoenas in conjunction with the marketing, pricing, and sale of generic drugs:

> In July 2014, the Company received interrogatories and subpoena from the State of Connecticut Office of the Attorney General concerning its investigation into pricing of digoxin. According to the subpoena, the Connecticut Attorney General is investigating whether anyone engaged in any activities that resulted in (a) fixing, maintaining or controlling prices of digoxin or (b) allocating and dividing customers or territories relating to the sale of digoxin in violation of Connecticut antitrust law. In June 2016, the Connecticut Attorney General issued interrogatories and a subpoena to an employee of the Company in order to gain access to documents and responses previously supplied to the Department of Justice. . . . .

> In fiscal year 2015 and 2016, the Company and certain affiliated individuals each were served with a grand jury subpoena relating to a federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act. The subpoenas request corporate documents of the Company relating to corporate, financial and employee information, communications or correspondence with competitors regarding the sale of generic prescription medications and the marketing, sale, or pricing of certain products, generally for the period of 2005 through the dates of the subpoenas.[26]

80.   In its March 13, 2015 Form 10-K submitted to the SEC, Par also disclosed that it had received subpoenas from both the Connecticut Attorney General and the DOJ's Antitrust Division regarding the generic drug industry:

---

[25] https://www.nytimes.com/2016/12/15/business/generic-drug-price-lawsuit-teva-mylan.html?_r=0.

[26] http://app.quotemedia.com/data/downloadFiling?webmasterId=101533&ref=11214259&type=HTML&symbol=LCI&companyName=Lannett+Co+Inc&formType=10-Q&dateFiled=2016-11-04.

On August 6, 2014, we received a subpoena from the Office of the Attorney General of the State of Connecticut requesting documents related to our agreement with Covis Pharma S.a.r.l. to distribute an authorized generic version of Covis's Lanoxin® (digoxin) oral tablets. We completed our response on October 28, 2014.

On December 5, 2014, we received a subpoena from the Antitrust Division of the DOJ requesting documents related to communications with competitors regarding our authorized generic version of Covis's Lanoxin® (digoxin) oral tablets and our generic doxycycline products. We intend to cooperate fully with the Department of Justice's inquiry.[27]

81.     The fact that these companies and/or their employees received subpoenas from a federal grand jury is significant, as is reflected in Chapter 3 of the 2014 edition of the DOJ's *Antitrust Division Manual*.[28] Section F.1 of that chapter notes that "staff should consider carefully the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution." *Id.* at III-82. The staff request needs to be approved by the relevant field chief and is then sent to the Antitrust Criminal Enforcement Division. *Id.* "The DAAG [Deputy Assistant Attorney General] for Operations, the Criminal DAAG, and the Director of Criminal Enforcement will make a recommendation to the Assistant Attorney General. If approved by the Assistant Attorney General, letters of authority are issued for all attorneys who will participate in the grand jury investigation." *Id.* at III-83. "The investigation should be conducted by a grand jury in a judicial district where venue lies for the offense, such as a district from or to which price-fixed sales were made or where conspiratorial communications occurred." *Id.* Thus, the fact that the Defendants

---

[27] https://www.sec.gov/Archives/edgar/data/878088/000087808815000002/prx-20141231x10k.htm.

[28] http://www.justice.gov/atr/public/divisionmanual/chapter3.pdf.

and certain of their employees received federal grand jury subpoenas is a strong indication that antitrust offenses have occurred.

82.     Commentators have also taken note of the criminal subpoenas. As reported on one legal website:

> The Justice Department's subpoenas focus on sharing and exchanging of pricing information and other issues among generic drug companies. The initial subpoenas, including two senior executives, suggest that the Justice Department has specific information relating to their participation in potentially criminal conduct. It is rare for the Justice Department to open a criminal investigation with specific subpoenas for individuals, along with company-focused subpoenas.
>
> Given the breadth of such a potential cartel investigation, the Justice Department's inquiry of the generic pharmaceutical industry could be significant. The prices for a large number of generic drug prices have increased significantly over the last year. There does not appear to be any rational explanation for such increases involving a diverse set of products.
>
> The scope of these price increases and the timing of them certainly raise serious concerns about collusive activity among competitors.[29]

83.     As Mark Rosman, former assistant chief of the National Criminal Enforcement Section of DOJ's Antitrust Division, noted in an article on the "unusual" nature of the criminal subpoenas, "[a] DOJ investigation into the alleged exchange of pricing information in the pharmaceutical industry likely indicates that the agency anticipates uncovering criminal antitrust conduct in the form of price-fixing or customer allocation."[30]

84.     Likewise significant is *Mlex*'s confirmation that a leniency applicant has sought amnesty from the DOJ. As the DOJ notes on its web site (http://www.justice.gov/atr/frequently-asked-questions-regarding-antitrust-divisions-leniency-program):

**5. Does a leniency applicant have to admit to a criminal violation of the**

---

[29] http://www.jdsupra.com/legalnews/criminal-global-cartel-focus-on-generic-92387/.

[30] https://www.wsgr.com/publications/PDFSearch/rosman-1114.pdf.

**antitrust laws before receiving a conditional leniency letter?**

Yes. The Division's leniency policies were established for corporations and individuals "reporting their illegal antitrust activity," and the policies protect leniency recipients from criminal conviction. Thus, the applicant must admit its participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets, customers, or sales or production volumes before it will receive a conditional leniency letter. Applicants that have not engaged in criminal violations of the antitrust laws have no need to receive leniency protection from a criminal violation and will receive no benefit from the leniency program.

What is more, the leniency applicant must also satisfy the following condition, among others, to avail itself of the government's leniency: "[t]he confession of wrongdoing is truly a corporate act, as opposed to isolated confessions of individual executives or officials." *Id*.

### Factors Increasing the Baclofen Market's Susceptibility to Collusion

85.     Publicly available data on the Baclofen market in the United States demonstrates that it is susceptible to price-fixing by the Defendants. Factors that make a market susceptible to collusion include: (1) a high degree of industry concentration; (2) significant barriers to entry; (3) inelastic demand; (4) the lack of available substitutes for the goods involved; (5) a standardized product with a high degree of interchangeability between the goods of cartel participants; (6) the absence of a competitive fringe of sellers; and (7) intercompetitor contacts and communication.

86.     ***Industry Concentration***. A high degree of concentration facilitates the operation of a cartel because it makes it easier to coordinate behavior among co-conspirators.

87.     In the United States Baclofen market, at the time of the conspiracy, the Defendants named here accounted for the vast majority of sales of Baclofen, accounting for over 90% of the market. This remained true throughout the Class Period. By 2014, Teva had 67% of the Baclofen tablet market, Qualitest (Par) had 21%, Upsher-Smith had 9% and Lannett had 3%.

88.     The market for Baclofen is mature, and the Defendants can only gain market share by competing on price.

27

89. ***Barriers to Entry***. Supracompetitive pricing (at odds with pricing that can be sustained in a competitive environment) in a market normally attracts additional competitors who want to avail themselves of the high levels of profitability that are available. However, the presence of significant barriers to entry makes this more difficult and helps to facilitate the operation of a cartel.

90. Here, there are significant capital, regulatory, and intellectual property barriers to entry in the market for Baclofen.

91. Manufacturing costs, coupled with regulatory oversight, represent a substantial barrier to entry into the Baclofen market. Intellectual property costs can also be sizable.

92. Entry into the market for Baclofen tablets has not occurred since 2009.

93. ***Demand Inelasticity***. Price elasticity of demand is defined as the measure of responsiveness in the quantity demanded for a product as a result of change in price of the same product. It is a measure of how demand for a product reacts to a change in price. The basic necessities of life—food, water, and shelter—are examples of goods that experience nearly perfectly inelastic demand at or near the minimums necessary to sustain life. In other words, a person on the verge of dying of thirst will pay almost anything for drinking water. In order for a cartel to profit from raising prices above competitive levels, demand for the product must be sufficiently inelastic such that any loss in sales will be more than offset by increases in revenue on those sales that are made. Otherwise, increased prices would result in declining revenues and profits.

94. Baclofen offers relief for MS patients who suffer from debilitating muscle spasms, allowing them to greatly improve their quality of life. Because the need for Baclofen is great among those who are suffering, and because the drug must be taken daily to keep

symptoms at bay, patients have little choice but to purchase Baclofen at the price at which it is offered. Thus, Baclofen is an excellent candidate for price-fixing because price increases will result in more revenue, rather than less.

95.    ***Lack of Viable Substitutes***. Baclofen has no viable substitutes. Although there are a handful of other centrally acting muscle relaxants, Baclofen is unique among them for (1) its desired effects, (2) its side effects, (3) its delivery vehicle, (4) its dosage sizes, (5) its utility with respect to contraindications and any comorbidities, and (6) its name recognition and familiarity throughout the MS medical community. This lack of viable substitutes for Baclofen is evidenced by data showing that during the Class Period, MS patients (and their prescribing physicians) did not switch from Baclofen to another centrally acting muscle relaxant despite significant price increases.

96.    ***Standardized Product with High Degree of Interchangeability***. A commodity-like product is one that is standardized across suppliers and allows for a high degree of substitutability among different suppliers in the market. When products offered by different suppliers are viewed as interchangeable by purchasers, it is easier for the suppliers to agree on prices for the good in question, and it is easier to monitor these prices effectively. Here, the Baclofen made by the Defendant manufacturers each contain identical active ingredients and are viewed as interchangeable by the pharmacies that fill the prescriptions.

97.    ***Absence of a Competitive Fringe of Sellers***. Companies that are not part of the conspiracy can erode the conspirators' market shares by offering products at a lower, more competitive price. This reduces revenue and makes sustaining a conspiracy more difficult. In the market for Baclofen, where Defendants make up the vast majority of the market and non-conspirators have and had very little foothold, there is no realistic threat that a fringe of

competitive sellers will take significant market share from Defendants. Defendants have oligopolistic power in the market for Baclofen, which facilitates their ability to raise prices without losing market share to non-conspirators.

98.     ***Intercompetitor Contacts and Communications***. In order to be successful, collusive agreements require a level of trust among the conspirators. Collaboration fostered through industry associations, trade shows, customer events, and private dinners facilitate relationships between individuals who would otherwise be predisposed to compete vigorously with each other. The state attorneys general have characterized the generic drug industry as "cozy." Here, for example, most of the Defendants are long-time members of or participants in the GPhA, which meets frequently and describes itself on its website as "the nation's leading trade association for manufacturers and distributors of generic prescription drugs, manufacturers of bulk active pharmaceutical chemicals, and suppliers of other goods and services to the generic industry." [31] Thus, representatives of the Defendants have opportunities to meet and conspire at functions of this group, including GPhA meetings immediately prior to and after the announcing Baclofen price increases, as well as at numerous other industry gatherings and private functions.

99.     The grand jury subpoenas discussed above lend further support to the conclusion that intercompetitor communications occurred among the Defendants with respect to the pricing of Baclofen. Indeed, according to the previously identified PaRR Report, "prosecutors are taking a close look at trade associations as part of their investigation as having been one potential avenue for facilitating the collusion between salespeople at different generic producers."

## DEFENDANTS' ANTITRUST VIOLATIONS

100.     During the Class Period, the Defendants engaged in a continuing agreement,

---

[31] http://www.gphaonline.org/about/the-gpha-association.

understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain, or stabilize the prices of Baclofen in the United States.

101. In formulating and effectuating the contract, combination or conspiracy, the Defendants identified above and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to artificially raise, fix, maintain, and/or stabilize the price of Baclofen sold in the United States. These activities included the following:

> a. Defendants participated in meetings and/or conversations to discuss the price of Baclofen in the United States;

> b. Defendants agreed during those meetings and conversations to charge prices at specified levels and otherwise to increase and/or maintain prices of Baclofen sold in the United States;

> c. Defendants agreed during those meetings and conversations to fix the price of Baclofen; and

> d. Defendants issued price announcements, customer bids, and price quotations in accordance with their agreements.

Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating the unlawful agreements described in this Complaint.

102. During and throughout the period of the conspiracy alleged in this Complaint, Plaintiff and members of the Classes purchased Baclofen from Defendants (or their subsidiaries or controlled affiliates) or their co-conspirators at inflated and supracompetitive prices.

103. Defendants' contract, combination, or conspiracy constitutes an unreasonable restraint of interstate trade and commerce in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) and the laws of various states.

104.    As a result of Defendants' unlawful conduct, Plaintiff and the other members of the Classes have been injured in their business and property in that they have paid more for Baclofen than they would have paid in a competitive market.

105.    The unlawful contract, combination, or conspiracy has had the following effects, among others:

a.      price competition in the market for Baclofen has been artificially restrained;

b.      prices for Baclofen sold by the Defendants have been raised, fixed, maintained, or stabilized at artificially high and non-competitive levels; and

c.      purchasers of Baclofen from the Defendants have been deprived of the benefit of free and open competition in the market for Baclofen.

## CLASS ACTION ALLEGATIONS

106.    Plaintiff brings this action on behalf of itself and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> All persons and entities in the United States and its territories who purchased, paid, and/or provided reimbursement for some or all of the purchase price for Defendants' Baclofen on or after February 1, 2014. This class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal and state governmental entities except for cities, towns, or municipalities with self-funded prescription drug plans; (c) all persons or entities who purchased Defendants' Baclofen for purposes of resale or directly from Defendants; (d) fully insured health plans (*i.e.*, health plans that purchased insurance covering 100% of their reimbursement obligation to members); (e) any "flat co-pay" consumers whose purchases of Defendants' Baclofen were paid in part by a third party payor and whose co-payment was the same regardless of the retail purchase price; and (f) any judges or justices involved in this action and any members of their immediate families.

107. Plaintiff also brings this action on behalf of itself and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, seeking damages pursuant to the common law of unjust enrichment and the state antitrust, unfair competition, and consumer protection laws of the states listed below (the "Indirect Purchaser States")[32] on behalf of the following class (the "Damages Class"):

> All persons and entities in the Indirect Purchaser States who purchased, paid, and/or provided reimbursement for some or all of the purchase price for Defendants' Baclofen on or after February 1, 2014. This class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal and state governmental entities except for cities, towns, or municipalities with self-funded prescription drug plans; (c) all persons or entities who purchased Defendants' Baclofen for purposes of resale or directly from Defendants; (d) fully insured health plans (i.e., health plans that purchased insurance covering 100% of their reimbursement obligation to members); (e) any "flat co-pay" consumers whose purchases of Defendants' Baclofen were paid in part by a third party payor and whose co-payment was the same regardless of the retail purchase price; and (f) any judges or justices involved in this action and any members of their immediate families.

108. The Nationwide Class and the Damages Class are referred to herein as the "Classes."

109. While Plaintiff does not know the exact number of the members of the Classes, Plaintiff believes there are thousands of members in each Class.

110. Common questions of law and fact exist as to all members of the Classes. This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to

---

[32] The "Indirect Purchaser States" consist of Alabama, Arkansas, Arizona, California, District of Columbia, Florida, Hawaii, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Missouri, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

all the members of both Classes, thereby making appropriate relief with respect to the Classes as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

  a.   Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain, and/or stabilize prices of Baclofen;

  b.   The identity of the participants of the alleged conspiracy;

  c.   The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

  d.   Whether the alleged conspiracy violated the Sherman Act, as alleged in the First Count;

  e.   Whether the alleged conspiracy violated state antitrust and unfair competition laws, and/or state consumer protection laws, as alleged in the Second and Third Counts;

  f.   Whether the Defendants unjustly enriched themselves to the detriment of the Plaintiff and the members of the Classes, thereby entitling Plaintiff and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the Fourth Count;

  g.   Whether the conduct of the Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiff and the members of the Classes;

  h.   The effect of the alleged conspiracy on the prices of Baclofen sold in the United States during the Class Period;

  i.   The appropriate injunctive and related equitable relief for the Nationwide Class; and

  j.   The appropriate class-wide measure of damages for the Damages Class.

111.   Plaintiff's claims are typical of the claims of the members of the Classes, and Plaintiff will fairly and adequately protect the interests of the Classes. Plaintiff and all members of the Classes are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for Baclofen purchased indirectly from the Defendants and/or their co-conspirators.

112.   Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

113.   The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

114.   Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

115.   The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

### FIRST COUNT
### Violation of Section 1 and 3 of the Sherman Act
### (on behalf of Plaintiff and the Nationwide Class)

116.   Plaintiff repeats the allegations set forth above as if fully set forth herein.

117.   Defendants and unnamed conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

118.   The acts done by each of the Defendants as part of, and in furtherance of, their contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

119.   During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to establish a price floor and artificially fix, raise, stabilize, and control prices for Baclofen, thereby creating anticompetitive effects.

120.   The conspiratorial acts and combinations have caused unreasonable restraints in the market for Baclofen.

121.   As a result of Defendants' unlawful conduct, Plaintiff and other similarly situated indirect purchasers in the Nationwide Class who purchased Baclofen have been harmed by paying inflated, supracompetitive prices for Baclofen.

122.   In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth herein.

123.   Defendants' conspiracy had the following effects, among others:

(a)   Price competition in the market for Baclofen has been restrained, suppressed, and/or eliminated in the United States;

(b)   Prices for Baclofen provided by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

36

(c)     Plaintiff and members of the Nationwide Class who purchased Baclofen indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

124.    Plaintiff and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for Baclofen purchased indirectly from Defendants and the co-conspirators than they would have paid and will pay in the absence of the conspiracy.

125.    The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

126.    Plaintiff and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

## SECOND COUNT
### Violation of State Antitrust Statutes
### (on behalf of Plaintiff and the Damages Class)

127.    Plaintiff repeats the allegations set forth above as if fully set forth herein.

128.    During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy with respect to the sale of Baclofen in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

129.    The contract, combination, or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain artificially supracompetitive prices for Baclofen.

130.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including: (a) participating in meetings and conversations among themselves in the United States during which

they agreed to price Baclofen at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiff and members of the Damages Class with respect to Baclofen provided in the United States; and (b) participating in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

131.   Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, increase, maintain, or stabilize prices of Baclofen.

132.   Defendants' anticompetitive acts described above were knowing and willful and constitute violations or flagrant violations of the following state antitrust statutes.

133.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Alabama Code § 6-6-60, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) price competition for Baclofen was restrained, suppressed, and eliminated throughout Alabama; (2) Baclofen prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Alabama; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for Baclofen. During the Class Period, Defendants' illegal conduct substantially affected Alabama commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Alabama Code § 6-6-60, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Alabama Code § 6-6-60, *et seq*.

134.     Defendants have entered into an unlawful agreement in restraint of trade in violation of Arizona Revised Statutes, §§ 44-1401, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) price competition for Baclofen was restrained, suppressed, and eliminated throughout Arizona; (2) Baclofen prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arizona; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for Baclofen. During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce. As a direct and proximate result of defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. §§ 44-1401, *et seq.*

135.     Defendants have entered into an unlawful agreement in restraint of trade in violation of California Business and Professions Code §§ 16700 *et seq*. During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of California Business and Professions Code Section §16720. Defendants, and each of them, have acted in violation of Section 16720 to fix, raise, stabilize, and maintain prices of Baclofen at supracompetitive levels. The aforesaid violations of Section 16720 consisted, without limitation, of a continuing unlawful trust and concert of action among the Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of Baclofen. For the purpose of forming and effectuating the unlawful trust, the Defendants and their co-conspirators have done

those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above and creating a price floor, fixing, raising, and stabilizing the price of Baclofen. The combination and conspiracy alleged herein has had, *inter alia*, the following effects: (1) price competition for Baclofen has been restrained, suppressed, and/or eliminated in the State of California; (2) prices for Baclofen provided by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California and throughout the United States; and (3) those who purchased Baclofen directly or indirectly from Defendants and their co-conspirators have been deprived of the benefit of free and open competition. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property in that they paid more for Baclofen than they otherwise would have paid in the absence of Defendants' unlawful conduct. As a result of Defendants' violation of Section 16720, Plaintiff and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to California Business and Professions Code § 16750(a).

136.    Defendants have entered into an unlawful agreement in restraint of trade in violation of District of Columbia Code Annotated §§ 28-4501, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) Baclofen price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Baclofen prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiff and members of the Damages Class, including those who resided in the District of Columbia and/or purchased Baclofen that were shipped by Defendants or their co-conspirators, were deprived of free and open competition, including in the District of Columbia; and (4)

Plaintiff and members of the Damages Class, including those who resided in the District of Columbia and/or purchased Baclofen in the District of Columbia that were shipped by Defendants or their co-conspirators, paid supracompetitive, artificially inflated prices for Baclofen, including in the District of Columbia. During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce. As a direct and proximate result of defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of District of Columbia Code Ann. §§ 28-4501, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. §§ 28-4501, *et seq.*

137.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Hawaii Revised Statutes Annotated §§ 480-1, *et seq*. Defendants' unlawful conduct had the following effects: (1) Baclofen price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) Baclofen prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for Baclofen. During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Hawaii Revised Statutes Annotated §§ 480-4, *et seq*. Accordingly, Plaintiff and members of the

Damages Class seek all forms of relief available under Hawaii Revised Statutes Annotated §§ 480-4, *et seq*.

138.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act (740 Illinois Compiled Statutes 10/1, *et seq.*). Defendants' combinations or conspiracies had the following effects: (1) Baclofen price competition was restrained, suppressed, and eliminated throughout Illinois; (2) Baclofen prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for Baclofen. During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury.

139.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Iowa Code §§ 553.1, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) Baclofen price competition was restrained, suppressed, and eliminated throughout Iowa; (2) Baclofen prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Iowa; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for Baclofen. During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing,

Defendants have entered into agreements in restraint of trade in violation of Iowa Code §§ 553.1, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Iowa Code §§ 553, *et seq.*

140.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Kansas Statutes Annotated, §§ 50-101, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) Baclofen price competition was restrained, suppressed, and eliminated throughout Kansas; (2) Baclofen prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Kansas; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for Baclofen. During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§ 50-101, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. §§ 50-101, *et seq.*

141.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Maine Revised Statutes (Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*). Defendants' combinations or conspiracies had the following effects: (1) Baclofen price competition was restrained, suppressed, and eliminated throughout Maine; (2) Baclofen prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Maine; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for Baclofen. During the

Class Period, Defendants' illegal conduct substantially affected Maine commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all relief available under Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

142.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Michigan Compiled Laws Annotated §§ 445.771, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) Baclofen price competition was restrained, suppressed, and eliminated throughout Michigan; (2) Baclofen prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for Baclofen. During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.771, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. §§ 445.771, *et seq*.

143.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Minnesota Annotated Statutes §§ 325D.49, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) Baclofen price competition was restrained,

suppressed, and eliminated throughout Minnesota; (2) Baclofen prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for Baclofen. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. §§ 325D.49, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Minnesota Stat. §§ 325D.49, *et seq*.

144.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Mississippi Code Annotated §§ 75-21-1, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) Baclofen price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) Baclofen prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Mississippi; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for Baclofen. During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mississippi Code Ann. § 75-21-1, *et seq.*

Accordingly, Plaintiff and members of the Damages Class seek all relief available under Mississippi Code Ann. § 75-21-1, *et seq.*

145.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) Baclofen price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) Baclofen prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for Baclofen. During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all relief available under Nebraska Revised Statutes §§ 59-801, *et seq.*

146.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Nevada Revised Statutes Annotated §§ 598A.010, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) Baclofen price competition was restrained, suppressed, and eliminated throughout Nevada; (2) Baclofen prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for Baclofen.

During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. §§ 598A, *et seq.*

147.    Defendants have entered into an unlawful agreement in restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) Baclofen price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) Baclofen prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for Baclofen. During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under New Hampshire Revised Statutes §§ 356:1, *et seq*.

148.    Defendants have entered into an unlawful agreement in restraint of trade in violation of New Mexico Statutes Annotated §§ 57-1-1, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) Baclofen price competition was restrained,

suppressed, and eliminated throughout New Mexico; (2) Baclofen prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for Baclofen. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all relief available under New Mexico Stat. Ann. §§ 57-1-1, *et seq.*

149.    Defendants have entered into an unlawful agreement in restraint of trade in violation of New York General Business Laws §§ 340, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) Baclofen price competition was restrained, suppressed, and eliminated throughout New York; (2) Baclofen prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for Baclofen that were higher than they would have been absent the Defendants' illegal acts. During the Class Period, Defendants' illegal conduct substantially affected New York commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of the

New York Donnelly Act, §§ 340, *et seq*. The conduct set forth above is a *per se* violation of the Act. Accordingly, Plaintiff and members of the Damages Class seek all relief available under New York Gen. Bus. Law §§ 340, *et seq*.

150.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes §§ 75-1, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) Baclofen price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Baclofen prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for Baclofen. During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under North Carolina Gen. Stat. §§ 75-1, *et seq*.

151.    Defendants have entered into an unlawful agreement in restraint of trade in violation of North Dakota Century Code §§ 51-08.1-01, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) Baclofen price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) Baclofen prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and

members of the Damages Class paid supracompetitive, artificially inflated prices for Baclofen. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Dakota Cent. Code §§ 51-08.1-01, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all relief available under North Dakota Cent. Code §§ 51-08.1-01, *et seq.*

152.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Oregon Revised Statutes §§ 646.705, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) Baclofen price competition was restrained, suppressed, and eliminated throughout Oregon; (2) Baclofen prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Oregon; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for Baclofen. During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Oregon Revised Statutes §§ 646.705, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all relief available under Oregon Revised Statutes §§ 646.705, *et seq.*

153.    Defendants have entered into an unlawful agreement in restraint of trade in violation of South Dakota Codified Laws §§ 37-1-3.1, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) Baclofen price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) Baclofen prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for Baclofen. During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws Ann. §§ 37-1, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under South Dakota Codified Laws Ann. §§ 37-1, *et seq*.

154.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Tennessee Code Annotated §§ 47-25-101, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) Baclofen price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) Baclofen prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Tennessee; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for Baclofen. During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and

members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Tennessee Code Ann. §§ 47-25-101, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Tennessee Code Ann. §§ 47-25-101, *et seq*.

155.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Utah Code Annotated §§ 76-10-911, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) Baclofen price competition was restrained, suppressed, and eliminated throughout Utah; (2) Baclofen prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Utah; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for Baclofen. During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Utah Code Annotated §§ 76-10-911, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Utah Code Annotated §§ 76-10-911, *et seq*.

156.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Vermont Stat. Ann. 9 §§ 2453, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) Baclofen price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Baclofen prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiff and members of the

Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for Baclofen. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Vermont Stat. Ann. 9 §§ 2453, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Vermont Stat. Ann. 9 §§ 2453, *et seq*.

157.    Defendants have entered into an unlawful agreement in restraint of trade in violation of West Virginia Code §§ 47-18-1, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) Baclofen price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) Baclofen prices were raised, fixed, maintained, and stabilized at artificially high levels throughout West Virginia; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for Baclofen. During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of West Virginia Code §§ 47-18-1, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under West Virginia Code §§ 47-18-1, *et seq*.

158.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes §§ 133.01*, et seq*. Defendants' combinations or conspiracies

had the following effects: (1) Baclofen price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) Baclofen prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for Baclofen. During the Class Period, Defendants' illegal conduct had a substantial effect on Wisconsin commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Wisconsin Stat. §§ 133.01, *et seq*.

159.     Plaintiff and members of the Damages Class in each of the above states have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy and agreement. Plaintiff and members of the Damages Class have paid more for Baclofen than they otherwise would have paid in the absence of Defendants' unlawful conduct. This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

160.     In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of Plaintiff and members of the Damages Class.

161.     Accordingly, Plaintiff and members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or

otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

### THIRD COUNT
### Violation of State Consumer Protection Statutes
### (on behalf of Plaintiff and the Damages Class)

162.     Plaintiff repeats the allegations set forth above as if fully set forth herein.

163.     Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

164.     Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of the Arkansas Code Annotated, § 4-88-101, *et seq*. Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which Baclofen was sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from Plaintiff and members of the Damages Class. The aforementioned conduct on the part of the Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10). Defendants' unlawful conduct had the following effects: (1) Baclofen price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) Baclofen prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for Baclofen. During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers. As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiff and members of

the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10) and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

165.    Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, *et seq*. During the Class Period, Defendants manufactured, marketed, sold, or distributed Baclofen in California, and committed and continue to commit acts of unfair competition, as defined by Sections 17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above. This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law. The Defendants' conduct as alleged herein violated Section 17200. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code §17200, *et seq.*, including, but not limited to, the following: (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of Section 16720, *et seq.* of the California Business and Professions Code, set forth above. Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of Section 16720, *et seq.* of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or

fraudulent; (3) Defendants' acts or practices are unfair to purchasers of Baclofen in the State of California within the meaning of Section 17200, California Business and Professions Code; and (4) Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code. Plaintiff and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts or practices. The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future. The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiff and members of the Damages Class to pay supracompetitive and artificially-inflated prices for Baclofen. Plaintiff and members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition. The conduct of Defendants as alleged in this Complaint violates Section 17200 of the California Business and Professions Code. As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiff and members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, §§17203 and 17204.

166.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and/or non-competitive levels, the prices at which

Baclofen was sold, distributed, or obtained in the District of Columbia. The foregoing conduct constitutes "unlawful trade practices," within the meaning of D.C. Code § 28-3904. Plaintiff and members of the Damages Class were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for Baclofen. Defendants had the sole power to set that price and Plaintiff and members of the Damages Class had no power to negotiate a lower price. Moreover, Plaintiff and members of the Damages Class lacked any meaningful choice in purchasing Baclofen because they were unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiff and members of the Damages Class could avoid the overcharges. Defendants' conduct with regard to sales of Baclofen, including their illegal conspiracy to secretly fix the price of Baclofen at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiff and the public. Defendants took grossly unfair advantage of Plaintiff and members of the Damages Class. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for purchasers so that there was a gross disparity between the price paid and the value received for Baclofen. Defendants' unlawful conduct had the following effects: (1) Baclofen price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Baclofen prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for Baclofen. As a direct and proximate result of the Defendants'

conduct, Plaintiff and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.*, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

167.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq*. Defendants' unlawful conduct had the following effects: (1) Baclofen price competition was restrained, suppressed, and eliminated throughout Florida; (2) Baclofen prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for Baclofen. During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. § 501.201, *et seq*., and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

168.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Hawaii Revised Statutes Annotated §§ 480-1, *et seq*. Defendants' unlawful conduct had the following effects: (1) Baclofen price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) Baclofen prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and

members of the Damages Class paid supracompetitive, artificially inflated prices for Baclofen. During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Hawaii Rev. Stat. § 480, *et seq.*, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

169. Defendants have engaged in unfair competition or unlawful, unfair, unconscionable, or deceptive acts or practices in violation of the Massachusetts Gen. Laws, Ch 93A, § 1, *et seq*. Defendants were engaged in trade or commerce as defined by G.L. 93A. Defendants, in a market that includes Massachusetts, agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which Baclofen was sold, distributed, or obtained in Massachusetts and took efforts to conceal their agreements from Plaintiff and members of the Damages Class. The aforementioned conduct on the part of the Defendants constituted "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce," in violation of Massachusetts Gen. Laws, Ch 93A, §§ 2, 11. Defendants' unlawful conduct had the following effects: (1) Baclofen price competition was restrained, suppressed, and eliminated throughout Massachusetts; (2) Baclofen prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Massachusetts; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and the members of the Damages Class paid supracompetitive, artificially inflated prices for Baclofen. During the Class Period, Defendants' illegal conduct substantially affected Massachusetts

commerce and consumers. As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Massachusetts Gen. Laws, Ch 93A, §§ 2, 11, that were knowing or willful, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute, including multiple damages.

170. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq.* Plaintiff and members of the Damages Class purchased Baclofen for personal or family purposes. Defendants engaged in the conduct described herein in connection with the sale of Baclofen in trade or commerce in a market that includes Missouri. Defendants agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which Baclofen was sold, distributed, or obtained in Missouri, which conduct constituted unfair practices in that it was unlawful under federal and state law, violated public policy, was unethical, oppressive and unscrupulous, and caused substantial injury to Plaintiff and members of the Damages Class. Defendants concealed, suppressed, and omitted to disclose material facts to Plaintiff and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Baclofen. The concealed, suppressed, and omitted facts would have been important to Plaintiff and members of the Damages Class as they related to the cost of Baclofen they purchased. Defendants misrepresented the real cause of price increases and/or the absence of price reductions in Baclofen by making public statements that were not in accord with the facts. Defendants' statements and conduct concerning the price of Baclofen were deceptive as they had the tendency or capacity to mislead Plaintiff and members

of the Damages Class to believe that they were purchasing Baclofen at prices established by a free and fair market. Defendants' unlawful conduct had the following effects: (1) Baclofen price competition was restrained, suppressed, and eliminated throughout Missouri; (2) Baclofen prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Missouri; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for Baclofen. The foregoing acts and practices constituted unlawful practices in violation of the Missouri Merchandising Practices Act. As a direct and proximate result of the above-described unlawful practices, Plaintiff and members of the Damages Class suffered ascertainable loss of money or property. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Missouri's Merchandising Practices Act, specifically Mo. Rev. Stat. § 407.020, which prohibits "the act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce…," as further interpreted by the Missouri Code of State Regulations, 15 CSR 60-7.010, *et seq.*, 15 CSR 60-8.010, *et seq.*, and 15 CSR 60-9.010, *et seq.*, and Mo. Rev. Stat. § 407.025, which provides for the relief sought in this count.

171.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1970, Mont. Code, §§ 30-14-103, *et seq.*, and §§ 30-14-201, *et. seq.* Defendants' unlawful conduct had the following effects: (1) Baclofen price competition was restrained, suppressed, and eliminated throughout Montana; (2) Baclofen prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (3) Plaintiff and

members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for Baclofen. During the Class Period, Defendants marketed, sold, or distributed Baclofen in Montana, and Defendants' illegal conduct substantially affected Montana commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code, §§ 30-14-103, *et seq*., and §§ 30-14-201, *et seq.*, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

172.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which Baclofen was sold, distributed, or obtained in New Mexico and took efforts to conceal their agreements from Plaintiff and members of the Damages Class. The aforementioned conduct on the part of the Defendants constituted "unconscionable trade practices," in violation of N.M.S.A. Stat. § 57-12-3, in that such conduct, inter alia, resulted in a gross disparity between the value received by Plaintiff and members of the Damages Class and the prices paid by them for Baclofen as set forth in N.M.S.A., § 57-12-2E. Plaintiff and members of the Damages Class were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for Baclofen. Defendants had the sole power to set that price and Plaintiff and members of the Damages Class had no

power to negotiate a lower price. Moreover, Plaintiff and members of the Damages Class lacked any meaningful choice in purchasing Baclofen because they were unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiff and members of the Damages Class could avoid the overcharges. Defendants' conduct with regard to sales of Baclofen, including their illegal conspiracy to secretly fix the price of Baclofen at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiff and the public. Defendants took grossly unfair advantage of Plaintiff and members of the Damages Class. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for Baclofen. Defendants' unlawful conduct had the following effects: (1) Baclofen price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Baclofen prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for Baclofen. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers. As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiff and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq.*, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

173.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.* Defendants agree to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Baclofen was sold, distributed, or obtained in New York and took efforts to conceal their agreements from Plaintiff and members of the Damages Class. Defendants and their co-conspirators made public statements about the prices of Baclofen that either omitted material information that rendered the statements that they made materially misleading or affirmatively misrepresented the real cause of price increases for Baclofen; and Defendants alone possessed material information that was relevant to consumers, but failed to provide the information. Because of Defendants' unlawful trade practices in the State of New York, New York class members who indirectly purchased Baclofen were misled to believe that they were paying a fair price for Baclofen or the price increases for Baclofen were for valid business reasons; and similarly situated consumers were potentially affected by Defendants' conspiracy. Defendants knew that their unlawful trade practices with respect to pricing Baclofen would have an impact on New York consumers and not just the Defendants' direct customers. Defendants knew that their unlawful trade practices with respect to pricing Baclofen would have a broad impact, causing consumer class members who indirectly purchased Baclofen to be injured by paying more for Baclofen than they would have paid in the absence of Defendants' unlawful trade acts and practices. The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants'

unlawful conduct had the following effects: (1) Baclofen price competition was restrained, suppressed, and eliminated throughout New York; (2) Baclofen prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for Baclofen. During the Class Period, Defendants marketed, sold, or distributed Baclofen in New York, and Defendants' illegal conduct substantially affected New York commerce and consumers. During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold, and/or distributed Baclofen in New York. Plaintiff and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349 (h).

174.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq*. Defendants agree to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Baclofen was sold, distributed, or obtained in North Carolina and took efforts to conceal their agreements from Plaintiff and members of the Damages Class. Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts. Secrecy was integral to the formation, implementation and maintenance of Defendants' price-fixing conspiracy. Defendants committed inherently deceptive and self-concealing actions, of which Plaintiff and members of the Damages Class could not possibly have been aware. Defendants and their co-conspirators publicly provided pretextual and false justifications regarding their price increases. Defendants' public statements concerning the price of Baclofen created the

illusion of competitive pricing controlled by market forces rather than supracompetitive pricing driven by Defendants' illegal conspiracy. Moreover, Defendants deceptively concealed their unlawful activities by mutually agreeing not to divulge the existence of the conspiracy to outsiders. The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) Baclofen price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Baclofen prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for Baclofen. During the Class Period, Defendants marketed, sold, or distributed Baclofen in North Carolina, and Defendants' illegal conduct substantially affected North Carolina commerce and consumers. During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold, and/or distributed Baclofen in North Carolina. Plaintiff and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, et seq., and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

175. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Rhode Island Unfair Trade Practice and Consumer Protection Act (R.I. Gen. Laws §§ 6-13.1-1, *et seq.*) Members of this Damages Class purchased Baclofen for personal, family, or household purposes. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Rhode Island, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Baclofen was sold, distributed, or obtained in Rhode Island. Defendants deliberately failed to disclose material facts to Plaintiff and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Baclofen. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business purchaser, Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' Baclofen prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) Baclofen price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) Baclofen prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for Baclofen. As a direct and proximate result of the Defendants' violations of law, Plaintiff and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Baclofen, likely misled all purchasers acting reasonably under the

circumstances to believe that they were purchasing Baclofen at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiff and members of the Damages Class as they related to the cost of Baclofen they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Rhode Island Gen. Laws. § 6-13.1-1, *et seq.*, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

176.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act (S.C. Code Ann. §§ 39-5-10, *et seq.*). Defendants' combinations or conspiracies had the following effects: (1) Baclofen price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) Baclofen prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for Baclofen. During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. §§ 39-5-10, *et seq.*, and, accordingly, Plaintiff and the members of the Damages Class seek all relief available under that statute.

177.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont, by affecting,

fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Baclofen was sold, distributed, or obtained in Vermont. Defendants deliberately failed to disclose material facts to Plaintiff and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Baclofen. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business purchaser, Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' Baclofen prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) Baclofen price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Baclofen prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for Baclofen. As a direct and proximate result of the Defendants' violations of law, Plaintiff and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Baclofen, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Baclofen at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitutes unfair competition or unfair or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

**FOURTH COUNT**
**Unjust Enrichment**
**(on behalf of Plaintiff and the Damages Class)**

178.    Plaintiff repeats the allegations set forth above as if fully set forth herein.

179.    As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched. Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on Baclofen.

180.    Defendants have benefited from their unlawful acts, and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiff and members of the Damages Class for Baclofen manufactured by Defendants during the Class Period.

181.    Plaintiff and members of the Damages Class are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct. Plaintiff and members of the Damages Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiff and members of the Damages Class may make claims on a *pro rata* basis.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment that:

1.      The Court determine that this action may be maintained as a class action under Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

2.      That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed: (a) an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act; (b) a *per se* violation of Section 1 of the Sherman Act; (c) an unlawful combination, trust, agreement, understanding, and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and (d) acts of unjust enrichment by Defendants as set forth herein.

3.      Plaintiff and members of the Damages Class recover damages, to the maximum extent allowed under such laws, and that a joint and several judgment in favor of Plaintiff and members of the Damages Class be entered against Defendants in an amount to be trebled to the extent such laws permit;

4.      Plaintiff and members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them;

5.      Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination

alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

6.    Plaintiff and members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment;

7.    Plaintiff and members of the Classes be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

8.    Plaintiff and members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

9.    Plaintiff and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: March 27, 2017

Respectfully submitted,

Michael D. Hausfeld
Sathya S. Gosselin
Jeannine M. Kenney
HAUSFELD LLP
1700 K Street NW, Suite 650
Washington, DC 20006
Tel: (202) 540-7200
Fax: (202) 540-7201
Email: mhausfeld@hausfeld.com
Email: sgosselin@hausfeld.com

Gary I. Smith, Jr.
Brent W. Landau
HAUSFELD LLP
325 Chestnut Street, Suite 900
Philadelphia, PA 19106
Tel: 215-985-3270
Fax: 215-985-2371
Email: gsmith@hausfeld.com
Email: blandau@hausfeld.com

Email: jkenney@hausfeld.com

Michael P. Lehmann
Bonny E. Sweeney
Christopher L. Lebsock
Stephanie Y. Cho
HAUSFELD LLP
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Tel: (415) 633-1908
Fax: (415) 358-4980
Email: mlehmann@hausfeld.com
Email: bsweeney@hausfeld.com
Email: clebsock@hausfeld.com

Lee Albert
Gregory B. Linkh
GLANCY PRONGAY & MURRAY LLP
122 E. 42nd Street
Suite 2920
New York, NY 10168
Telephone: (212) 682-5340
Fax: (212) 884-0988
Email: lalbert@glancylaw.com
Email: glinkh@glancylaw.com

Frank R. Schirripa
Daniel B. Rehns
HACH ROSE SCHIRRIPA & CHEVERIE LLP
185 Madison Avenue
New York, New York 10016
Tel: (212) 213-8311
Email: fschirripa@hrsclaw.com
Email: drehns@hrsclaw.com

*Counsel for Plumbers & Pipefitters Local 178 Health & Welfare Trust Fund*